UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In re DSC Limited,                                    Case No. 05-72779
                                                      Honorable Patrick J. Duggan


_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 28, 2006.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
            U.S. DISTRICT COURT JUDGE

This matter comes before the Court as an appeal from a decision of the United

States Bankruptcy Court for the Eastern District of Michigan, the Honorable Thomas J.

Tucker presiding.  Petitioning creditors Crown Enterprises, Inc. ("Crown") and

Riverview-Trenton Railroad Company ("RTRR") challenge Judge Tucker's finding that

they were not "qualifying petitioning creditors" pursuant to 11 U.S.C. § 303 and therefore

that there were insufficient qualifying petitioning creditors to pursue an involuntary

bankruptcy against the alleged debtor, DSC Limited ("DSC").  Crown and RTRR also

challenge Judge Tucker's decision not to allow O'Brien & Gere Engineers, Inc.

("O'Brien & Gere") to join the involuntary petition when O'Brien & Gere filed its joinder

notice beyond the court's deadline for creditors to join the involuntary bankruptcy

petition.  This matter has been fully briefed by the parties and the Court does not believe

1

that oral argument or a hearing is necessary.  Upon review of the parties' briefs, the

transcripts of the bankruptcy proceedings, and the exhibits introduced therein, this Court

affirms the decision of the bankruptcy court.

## I.      Factual and Procedural Background

In 1996, DSC purchased the assets of bankrupt McLouth Steel.  These assets

included contiguous land along the Detroit River in the cities of Riverview and Trenton,

Michigan ("Riverview-Trenton Parcel"), as well as acreage in Gibraltar, Michigan (at

least a portion of which hereafter will be referred to as the "Randazzo Parcel"[1]).  The

Riverview-Trenton Parcel contained serious environmental contamination from McLouth

Steel's prior use.  In December 1999, DSC entered into a consent order with the Michigan

Department of Environmental Quality ("MDEQ") and the Michigan Attorney General

whereby DSC agreed to take certain remedial action in order to clean up the Riverview-

Trenton Parcel as well as other land owned by DSC in Trenton and Gibraltar.  *See*

Appellants' Supp. Ex. 7.  The consent order further required DSC to pay $1.5 million

annually into a trust fund until the remedial actions required by the order were completed.

*See id*.

In 1999, DSC agreed to sell 76 acres of the Riverview-Trenton Parcel to Crown.

The transaction between DSC and Crown involved a series of documents, including an

Environmental Obligations Implementation Agreement ("EOIA"), an Environmental

---

[1]The parties referred to the property as the "Randazzo Parcel" because one of the
principals of P&R Acquisitions LLC, a proposed purchaser, was Anthony Randazzo.

Escrow Agreement, and a Right of First Refusal Agreement ("RFRA").  Although part of the River-Trenton Parcel transaction, the RFRA only granted Crown certain rights with respect to DSC's land in Gibraltar, including the Randazzo Parcel.[2]

Essentially the EOIA obligated DSC to use its best efforts to perform the corrective action required by the consent order between DSC and the State in order to clean up the purchased land.  *See* DSC Ex. 5.  The EOIA required DSC to update Crown with respect to any remedial action taken and to provide Crown with the opportunity to comment on or offer revisions to any corrective work presented to the State for the latter's approval.  *See id.*  Pursuant to the Environmental Escrow Agreement, DSC was required to deposit $1.5 million into an escrow account in order to complete the remedial work described in the EOIA.  *See* DSC Ex. 47.  The EOIA and the Environmental Escrow Agreement provide that the agreements are intended "for the benefit only of the parties and their respective heirs, personal representatives, successors, and assigns."  *See id.* and Ex. 5.

The RFRA essentially required DSC to notify Crown of any bona fide offer DSC received on certain land in Gibraltar, including the Randazzo Parcel, which DSC indicated a willingness to accept and gave Crown the right to purchase the land on the

---

[2]Previously there was a dispute between DSC on one hand and Crown and RTRR on the other hand as to what land was subject to the RFRA.  Prior to the filing of the involuntary bankruptcy petition, however, the parties entered into a consent order in which they agreed that the right of first refusal applied only to DSC's Gibraltar property. *See* DSC Ex. 26

terms and conditions set forth in that offer. *See* DSC Ex. 4. The RFRA also prohibited DSC from selling the land except pursuant to a bona fide offer. *See id.* According to Paragraph 8 of the RFRA, the agreement and all of its terms and provisions "constitute covenants running with the land, shall burden the Property, and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including successors in title to all or any portion of the Property . . ." *See id.*

Sometime after June 2000, Crown conveyed the 76-acre Riverview-Trenton Parcel that it purchased from DSC to RTRR.

Sometime in 2002, DSC quit-claimed the Randazzo Parcel to Gibraltar Land Company ("GLC"). GLC is an affiliate of DSC. In 2003, GLC received a letter of intent from P& R Acquisitions LLC ("P&R") to purchase the Randazzo Parcel. In May 2004, P&R submitted a purchase agreement to GLC for the Randazzo Parcel. DSC claims that it provided Crown and RTRR with notice of the letter of intent and the purchase agreement pursuant to the Right of First Refusal Agreement.

On December 19, 2003, Crown, RTRR and Manual J. Moroun (the owner of both companies) filed suit in the Wayne County Circuit Court against DSC, GLC, and others. In the Wayne County lawsuit, the plaintiffs alleged *inter alia* that the defendants breached the RFRA and the EOIA. Judge Susan Borman, who presided over the Wayne County litigation, scheduled several settlement conferences with the parties. On January 6, 2005, the parties reached an alleged settlement and placed the terms of that alleged settlement on the record.

4

The terms placed on the record included[3] the parties' agreement to a traditional mutual and general release provision, the specific words which would subsequently be resolved by the parties. The parties further provided that the Randazzo Parcel would remain in the name of GLC, the record title holder at that time. Upon closing of the sale of the Randazzo Parcel to P&R, the parties agreed that the net proceeds from the sale up to $2.5 million would be put into an environmental escrow account. Additionally, GLC agreed to give one or more of the plaintiffs a security interest in the form of a non-recourse mortgage at the time of the entry of the consent judgment in order to secure the plaintiffs' claim in the proceeds of the sale of the Randazzo Parcel. DSC agreed to provide a similar mortgage with respect to an additional 18 acre parcel which could be discharged upon DSC's payment of $200,000 into the environmental escrow account. In the event the sale to P&R did not occur by December 31, 2005, the parties indicated that the agreement would contain a provision for the mortgage on the Randazzo Parcel to be reduced or adjusted according to an established formula.

The parties further provided that the funds in the environmental escrow account would be disbursed pursuant to an escrow agreement with an escrow agent in order to complete the remedial environmental work on the 76-acre Riverview-Trenton Parcel as required under the consent order between DSC and the State. The parties agreed that any surplus money remaining in the escrow account after completion of the required

---

[3]This summary does not include every term placed on the record in the Wayne County Circuit Court but is meant to relate the general provisions.

5

environmental work would be paid to GLC.

The parties also stated on the record that there would be a complete termination and release of the existing Right of First Refusal Agreement without conditions. The parties further indicated that if the proceeds from the sale of the Randazzo Parcel and DSC's 18 acres was insufficient to complete the clean up required under the consent order, then the plaintiffs would have no recourse against the defendants. Further, as a condition of the agreement, the defendants agreed to admit in the state court that there was a breach of the RFRA and EOIA. As Mr. Seikaly [Crown's and RTRR's counsel] interjected later, the agreement required an admission by the defendants that their obligations within the agreement are fixed and owing and that the defendants are liable to the extent of the agreement. Finally, DSC and GLC would be jointly obligated to pay $50,000 to Crown upon the signing of the settlement agreement and an additional $50,000 on or about August 31, 2005. *See* Bankruptcy Trans. of 4/26/05 Bench Op. at 36-43; *see also* DSC Ex. 28.

After the terms of the alleged settlement were stated on the record, Judge Borman asked the representatives from both sides– Michael Wilkinson for the defendants and Dannie Stamper for the plaintiffs– whether they agreed to the settlement and they indicated that they did. *See* DSC Ex. 28 at 20-21. Counsel for DSC, Mr. Barr, then stated that he would prepare a draft of the settlement documents within 21 days. *See id*. at 21-22.

Mr. Seikaly, counsel for Crown and RTRR, then raised the issue of what would

6

happen if the sale of the Randazzo Parcel was not consummated by December 31, 2005.

*See id*. at 22.  Mr. Seikaly also raised the issue of what would happen if the parties did not

get "affirmation" of the Randazzo deal by the time the settlement documents were due–

i.e., January 27, 2005.  *See id*. at 24.  As Mr. Seikaly explained to Judge Borman:

> And the reason, your Honor . . . why [we] would want the
> option out if the Randazzo deal is not reaffirmed is because
> there are numerous things that are done in connection with
> that deal, it increased the value of the property.  And if those
> aren't going to get done, my client may decide to not move
> forward.

*See id*. at 26.  Mr. Seikaly subsequently stated: "The point is, your Honor, that if it – if the

Randazzo deal does not go through or isn't reaffirmed so that these various things can't

be done, my client simply has an option within a relatively brief period of time to say

okay, then we're not going to go forward with the settlement agreement . . ."  *Id*. at 27.

        In response to Mr. Seikaly's concerns, Judge Borman expressed her belief that

there was no settlement: "If he [Mr. Seikaly's client] has the option of not going through

with it, what settlement agreement do we have."  *See id*.  Judge Borman then asked the

parties how P&R could avoid its purchase agreement with GLC.  *See id*.  The parties

discussed several reasons why P&R could get out of the agreement, for example: if P&R

had not signed the purchase agreement; if P&R had not tendered the deposit required by

the agreement; if P&R claimed that the agreement was stale; and, if P&R refused to agree

to an extension of the deadlines previously set forth in the agreement.  *See id*. at 28-29.

At that point, Judge Borman stated: "I can't really tell if we have a settlement or if we just

7

have a lot of loopholes put in here for either party to get out . . ." *See id*. at 29. The parties then began discussing possible options if the purchase agreement between GLC and P&R fell through, although it appears from the subsequent and final minutes of the hearing that the parties did not reach a resolution. *See id*. at 29-33.

In the final minutes of the hearing before Judge Borman, Mr. Barr (DSC's counsel) stated that his clients were not able to agree to the suggestion of the plaintiff's counsel as to how to structure the agreement if GLC's sale of the Randazzo Parcel to P&R fell through. *See id*. at 33. Mr. Barr therefore asked the court for time to consult with Mr. Randazzo. *See id*. at 34. Judge Borman denied the request. Mr. Barr then stated, "[w]ell, otherwise we don't think we have a meeting of the minds . . ." explaining to Judge Borman that "we can't agree to the fallback provision that Mr. Seikaly is suggesting." *See id*. Judge Borman responded: "Then come up with another fallback position. Now, do it now." *See id*. The transcript of the proceedings reflects that a break then was taken; the next notation indicates that the proceedings concluded. *See id*.

The following day, January 7, the parties sent a letter to Judge Borman indicating that DSC had reviewed its files and had determined that the purchase agreement between GLC and P&R had been signed by both parties. *See* DSC Ex. 29. The parties therefore asked Judge Borman to "consider the settlement to be approved on the terms placed on the record yesterday, with the exception that the provisions concerning the possible refiling or reinstatement of the case in the event that the Randazzo entity did not sign a new purchase agreement will be deleted . . ." *See id*.

8

Thereafter, Mr. Barr prepared a draft of the settlement agreement which he forwarded to Mr. Seikaly by electronic mail ("e-mail") on January 14, 2005.  In his e-mail, Mr. Barr wrote in part:

> Please contact me once you've gotten through this draft. There were some forks in the road as I updated the draft that we may need to discuss.  For example, I've added some deadlines for the parties to come up with environmental cost estimates so the process has some structure.  I'm not trying to change the deal we agreed to in court, but only make the details be workable and sensible.

See DSC Ex. 30.  Mr. Barr also suggested that he and Mr. Seikaly meet the following week to discuss the draft.  See id.

On January 18, Mr. Seikaly responded to Mr. Barr's e-mail as follows:

> Thank you for the draft of the settlement agreement.  I have forwarded it on to Mark Shapiro [co-counsel for DSC] and my clients.  Mark is on vacation until Monday but I am working on comments and hope to get a draft back to you early next week.
>
> My client has requested that we obtain information on the status and plans of Mr. Randazzo.  Specifically they would like a writing from him as to his intentions regarding the property and the development.  I assume you would rather make the contact than have me do it.
>
> Thank you for your attention and cooperation in connection with this matter.

See DSC Ex. 31.  Mr. Seikaly only responded to Mr. Barr's request to meet and discuss the draft of the settlement agreement a few days later, in an e-mail dated January 21:

> I can probably be available to meet next week, however my clients are really pushing for a confirmation from Randazzo.

9

> I am afraid that if we do not get something they will argue
> that they were fraudulently induced into the settlement. They
> have not taken this position yet, but it is my concern. I have
> not directly contacted Randazzo because I did not want
> anything I did or said in connection with him to be
> misconstrued.
>
> Can you please advise on whether you can get confirmation
> from him, or if it is ok for me to contact him directly. I would
> like this done before we meet.

*See* DSC Ex. 33. Mr. Barr responded to this communication a couple of hours later,

confirming that there is a signed agreement with Randazzo "which is what we represented

and what we told the judge." *See* DSC Ex. 34. Mr Barr indicated that "[w]e are working

on getting it amended to incorporate new dates. I hope to hear back from them early next

week." *See id*. Mr. Barr further wrote: "There is no fraud. Let's go on with the

agreement. If you want to hold up on it now, we have to go to the judge and explain why

. . ." *See id*.

Mr. Seikaly sent the following response to Mr. Barr later that day:

> I think you are over reacting. Actually, by reading your
> response, I am concerned that you may in fact be in trouble
> with the Randazzo agreement. As I indicated in my original
> e[-]mail, my client is simply pressing me to confirm that you
> do have an agreement with Randazzo, the concern is what I
> am speculating about. Do you have any problem with my
> contacting Randazzo directly.
>
> Before I can meet I will need a response on a number of
> points from my client. I am convinced I will not get the
> direction that I need until I can give them assurances about
> the Randazzo deal being "real." If you would rather just meet
> with the judge I am happy to do so, but I thought the objective
> was to close the deal. Your e[-]mail causes concerns that my

10

clients lack of faith in the deal being real may be justified . . .

*See* DSC Ex. 35.

On January 26, 2005– the day before the executed settlement agreement was due to be presented to the Wayne County Circuit Court– Mr. Barr sent a letter to Mr. Seikaly expressing his concern that he still had not received any comments on the proposed settlement agreement, despite having sent a proposed draft to Mr. Seikaly on January 14. *See* DSC Ex. 37. Mr. Barr again requested Mr. Seikaly's comments on or approval of the proposed agreement. *See id*. Mr. Seikaly sent a letter to Mr. Barr via e-mail at 4:42 p.m. that day raising a new concern of his client with respect to the agreement:

> My client has learned that your client, DSC, is attempting to reach an out-of-court "workout" with its creditors and, failing to achieve such a resolution intends on filing a bankruptcy on or before February 15, 2005. Further they have been informed that such a bankruptcy would result in the requirement that any funds we receive from this settlement would be repaid, and the mortgage intended to protect the settlement would be voided. For this reason my client has instructed that we not proceed with the settlement agreement. Mark Shapiro, a representative of our client, and I will appear in Judge Borman's courtroom tomorrow morning at 9:30 a.m. to inform the court of this development.
>
> I do not believe my clients will be willing to change their position absent some form of guarantee that DSC will not be filing bankruptcy within the next ninety (90) days and, should they do so, Mr. Wilkinson would personally guarantee the terms of the settlement.

*See* DSC Ex. 38.

Mr. Barr immediately responded to Mr. Seikaly's letter, stating emphatically that

11

"**<u>DSC Ltd. is not negotiating with its creditors for any workout and is not
considering bankruptcy.</u>**" *See* DSC Ex. 39 (emphasis in original).  Mr. Barr further
expressed his disbelief that after sending Mr. Seikaly a proposed settlement agreement on
January 14 and repeatedly requesting comments, Mr. Seikaly would wait until 4:42 in the
afternoon before the executed agreement was due to raise the financial condition of DSC
as an issue to back out of or modify the agreement.  *See id*.  Mr. Barr then indicated that
his clients were prepared to execute the settlement agreement in its current form.  *See id*.
Mr. Barr never received a response to his letter and the parties did not subsequently meet
with Judge Borman.

Instead, on the following day (January 27, 2005), Crown, RTRR, and several other
entities filed the involuntary bankruptcy petition in this case.  *See* DSC Ex. 1.  In its
answer to the involuntary petition, DSC contended that several of the entities joining the
petition were not creditors of DSC, but rather creditors of DSC's affiliates.  *See* Docket
#15.  DSC also claimed that a number of the petitioners did not file the involuntary
bankruptcy petition in good faith.  *See id*.

On February 16, 2005, Crown, RTRR, Harry Miller Corporation, Voest-Alpine
Industries, Inc ("Voest-Alpine"), and Ebner Furnaces, Inc. ("Ebner") filed an Amended
Involuntary Petition.  *See* DSC Ex. 2.  The earlier petitioning creditors whose status DSC
challenged were not named in the amended complaint.  Harry Miller Corporation– which
was listed as a petitioning creditor in the amended petition– subsequently withdrew.  DSC
filed an answer to the amended petition again disputing the eligibility and/or good faith of

12

some of the petitioning creditors.  *See* Docket #22.

The bankruptcy court conducted a scheduling conference on February 17, 2005. At the conference, the court issued an order scheduling the trial on the involuntary petition for March 1, 2005.[4]  *See* Docket #19.  After conferring with the parties– and without any objections– Judge Tucker also set a February 28, 2005 deadline for DSC's creditors to join the involuntary petition.  *See id*.  The order, which informs DSC's creditors that they must file a "Notice of Joinder" on or before that date if they want to join the petition, subsequently was mailed to DSC's creditors.  *See id*.

On February 28, O'Brien & Gere notified DSC and the bankruptcy court via e-mail that it would be joining in the involuntary petition but that it had not been able to file its joinder papers that day.  *See* Tr. 3/1/05 at 52-53.  At the beginning of the proceedings the following day, the petitioning creditors asked Judge Tucker to allow O'Brien & Gere to join the involuntary petition.  *See id*. at 53-56.  At that time, however, O'Brien & Gere still had not filed a "Notice of Joinder" and no one representing O'Brien & Gere was present in the courtroom.  *See id*.  Judge Tucker denied the joinder request, reasoning that he afforded creditors a reasonable opportunity to join the petition and that O'Brien & Gere failed to meet that deadline.  *See id*. at 58-61.

The trial on the involuntary petition then began and continued on March 8, 21-22, and 29 and April 5 and 11-12.  On April 26, Judge Tucker issued an oral opinion finding

---

[4]The petitioning creditors had requested an expedited hearing on their petition.

first that Voest-Alpine and Ebner were qualifying petitioning creditors.  *See* Trial Tr.
4/26/05 at 21. Judge Tucker concluded, however, that Crown and RTRR did not qualify
as petitioning creditors because there was a genuine issue of material fact bearing on
DSC's liability to Crown and RTRR and/or the amount of Crown's and RTRR's claims
against DSC.  *See id.* at 35-36 & 56-57.  As a result, Judge Tucker held that there were
insufficient qualifying petitioning creditors to pursue an involuntary bankruptcy against
DSC pursuant to 11 U.S.C. § 303.  Judge Tucker reserved ruling on the issue of whether
the petitioning creditors filed the involuntary petition in good faith.  Based on his opinion,
Judge Tucker also issued an order on April 26 dismissing the amended involuntary
petition.  *See* Docket #132.

On May 6, 2005, the petitioning creditors filed a motion to amend Judge Tucker's
April 26 opinion and order and a motion for reconsideration with respect to the opinion
and order.  In their motion for reconsideration, the petitioning creditors argued *inter alia*
that Judge Tucker lacked the authority to set a deadline for DSC's creditors to join the
involuntary petition.  Judge Tucker subsequently denied both motions.

Sometime after April 26, DSC reached a settlement with O'Brien & Gere wherein
DSC agreed to pay a sum of money to O'Brien & Gere in exchange for a discharge of the
latter's debt.  On June 7, 2005, O'Brien & Gere filed a notice withdrawing its
participation from the involuntary bankruptcy proceeding, effective May 26, 2005.  *See*
Docket #168.  On July 1, 2005, Crown and RTRR filed the instant appeal.

**II.     Standard of Review**

14

Dismissal of a bankruptcy case is reviewed for abuse of discretion. *In re Eastown Auto Co.*, 215 B.R. 960, 963 (B.A.P. 6th Cir. 1998)(citations omitted). "A bankruptcy court abuses its discretion when 'it relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard.'" *Id.* (quoting *In re Downs*, 103 F.3d 472 (6th Cir. 1996)).

The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard. *Id.* (citing FED. R. BANKR. P. 8013). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 963-64 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1411 (1985)). Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that the bankruptcy judges "[f]inding of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." FED. R. BANK. P. 8013. Moreover, due regard must be given to the trial court's opportunity to judge the credibility of the witnesses. *See id.*

The bankruptcy court's conclusions of law are reviewed de novo. *In re Eastown Auto Co.*, 215 B.R. at 964 (citing *Nicholson v. Isaacman*, 23 F.3d 629 (6th Cir. 1994)). This means that the reviewing court must decide legal issues as if the issues had not been decided before. *Id.* (citing *In re Downs*, 103 F.3d 472). No deference is granted to the bankruptcy court's conclusions. *Id.* (citing *Razavi v. Comm'r*, 74 F.3d 125 (6th Cir. 1996)).

15

### III.    Applicable Law and Analysis

The involuntary petition against DSC was filed pursuant to 11 U.S.C. § 303.  As DSC had more than twelve creditors, Section 303(b)(1) provides that the involuntary petition had to be filed by three or more qualifying petitioning creditors:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title–
>
> **(1)** by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $12,300 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims . . .

11 U.S.C. § 303(b)(1), as amended effective April 20, 2005.[5]  Thus to qualify as a petitioning creditor under Section 303(b)(1), an entity must hold a claim against the debtor that is not contingent as to liability and that is not the subject of a bona fide dispute as to liability or amount.  A number of Circuit Courts, including the Sixth Circuit, follow the test set forth in *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986), to determine whether a claim is subject to a bona fide dispute:

---

[5]As the Historical and Statutory Notes to Section 303 provide, the 2005 amendments to the section applied retroactively to this case: "This section and the amendments made by this section [amending this section] shall take effect on the date of the enactment of this Act [Apr. 20, 2005] and shall apply with respect to cases commenced under title 11 of the United States Code before, on, and after such date." (quoting Pub. L. 109-8, Title XII, § 1234(b) (bracketed sections in original)).

> "If there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed . . . In determining whether a claim is subject to a bona fide dispute, the bankruptcy court must not resolve any genuine issues of fact or law.

*In re Eastown Auto Co.*, 215 B.R. at 965 (quoting *In re Lough*, 57 B.R. at 997).

### A.    Mootness

As an initial matter, DSC contends that this appeal has been rendered moot as a result of appellants' failure to seek a stay of Judge Tucker's dismissal of the involuntary bankruptcy petition.  According to DSC, in the absence of a stay, it continued to conduct its affairs as a non-debtor after the dismissal, including reaching a settlement and paying certain creditors such as O'Brien & Gere.  DSC argues that those creditors could suffer prejudice if this Court reverses Judge Tucker's dismissal order because they could be subjected to litigation for recovery of the settlement money they received from DSC.

The United States Bankruptcy Appellate Panel of the Sixth Circuit has explained when an appeal from the bankruptcy court becomes moot:

> Mootness occurs "when the plaintiff receives the relief sought or when it is factually, not legally, impossible to receive such relief." *Liberles v. County of Cook*, 709 F.2d 1122, 1127 (7th Cir. 1983).  The burden of demonstrating mootness on appeal is on the party asserting it, and meeting the burden requires a showing "that the outcome of this appeal *could not* affect the legal interests of the parties." *Ohio v. Madeline Marie Nursing Homes Nos. 1 and 2*, 694 F.2d 449, 463 (6th Cir. 1982)(emphasis added [by citing court]).  As another court has put it, "In deciding a mootness issue, 'the question is not whether the precise relief sought at the time the application for an injunction was filed is still available.  The question is

17

> whether there can be any effective relief.'" *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001)(quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986)(quoting *Northwest Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241-1244-45 (9th Cir. 1988)).

*In re Swallen's, Inc.*, 269 B.R. 634, 639 (B.A.P. 6th Cir. 2001).  The *Swallen's* court concluded that the appeal in that case was not moot, finding that relief for the appellants "[was] still at least partly available because [the] Appellants could conceivably improve their positions if the appeal [was] decided in their favor."  *Id.*

DSC fails to demonstrate that appellants will not be able to obtain *any* effective relief if this Court reverses Judge Tucker's dismissal of the involuntary bankruptcy petition.  While the absence of a stay enabled DSC to settle the claims of at least two of its creditors after the dismissal, DSC presents no evidence to suggest that it now lacks assets to pay the debts– at least in part– of additional creditors.  With respect to DSC's claim of prejudice, the Court is not convinced that DSC's concern of litigation against those creditors with which it settled is well-founded.  The Court therefore concludes that this appeal, as a general matter, is not moot.

**B.      The Bankruptcy Court's Denial of O'Brien & Gere's Joinder Request**

Appellants contend that Judge Tucker erred in refusing O'Brien & Gere's request to join the involuntary bankruptcy petition.  Relying on 11 U.S.C. § 303(c)[6], appellants

---

[6]Section 303(c) provides that before an involuntary petition is dismissed or relief is ordered "a creditor holding an unsecured claim that is not contingent, other than a creditor filing under section (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under section (b) of this section." 11

18

argue that joinder is a matter of right before a case is dismissed or relief is ordered and that a bankruptcy court may not impose any conditions on that right, such as a deadline for joinder. Appellants therefore argue that the bankruptcy court abused its discretion when it imposed the February 28 deadline for DSC's creditors to join the involuntary petition.

None of the cases cited by the parties resolve whether a bankruptcy court may impose a reasonable deadline for creditors of a debtor to join an involuntary bankruptcy petition. While the trial courts had imposed such deadlines in some of the cases cited by the parties, in none of those cases was the imposition of the deadline challenged on appeal. The Bankruptcy Appellate Panel of the Sixth Circuit was presented with the issue of whether setting a deadline for creditors to join an involuntary petition violates 11 U.S.C. § 303(c) in *In re Eastown Auto Company*; however, the appellate court avoided the issue because it found that no creditors had sought to join the petition prior to the trial court's dismissal of the involuntary petition. 215 B.R. at 970.

This Court likewise does not need to resolve the issue because it finds that DSC's settlement with O'Brien & Gere and the latter's subsequent notice of withdrawal from the bankruptcy proceedings renders moot appellants' challenge to Judge Tucker's denial of O'Brien & Gere's request to join the involuntary bankruptcy petition. Appellants argue that O'Brien & Gere's notice of withdrawal did not moot this issue based on the well-

_____

U.S.C. § 303(c).

19

established rule that a petitioning creditor's post-petition withdrawal does not render the petition insufficient for lack of a sufficient number of eligible creditors under 11 U.S.C. § 303(b)(1) and that a court may even refuse a petitioning creditor's request to withdraw if to do so would defeat the involuntary petition.  *See* Reply at 5 (citing *In re Sjostedt*, 57 B.R. 117, 120 (Bankr. M.D. Fla. 1986); *Reed v. Thornton*, 43 F.2d 813 (9th Cir. 1930); *In re Carvalho Indus., Inc.*, 68 B.R. 254, 256 (Bankr. D. Ore. 1986); *In re Ross*, 63 B.R. 951, 962 (Bankr. S.D.N.Y. 1986)); *see also In re Mollen Drilling Co.*, 68 B.R. 840, 842-43 (Bankr. D. Mont. 1987); *In re Elsub Corp.*, 70 B.R. 797, 809 (Bankr. D.N.J. 1987). Appellants contend that if this Court finds that Judge Tucker erred in setting the joinder deadline and therefore erred in refusing O'Brien & Gere's joinder request, O'Brien & Gere would be counted as a qualifying petitioning creditor for the purpose of determining whether there was a sufficient number of creditors to pursue the involuntary petition against DSC.

The well-established rule to which appellants refer, however, applies to petitioning creditor's that have expressly joined in the petition.  *See In re Elsub*, 70 B.R. 797, 810-11 (Bankr. D.N.J. 1987)(holding that withdrawal of creditors' petitions for joinder in involuntary bankruptcy petition would be permitted where there had not yet been any express joinder of creditors in the original petition).  In this case, O'Brien & Gere never was joined as a petitioning creditor.  This Court therefore concludes that it could voluntarily withdraw from the proceedings without the bankruptcy court's permission and regardless of whether its withdrawal would result in an insufficient number of petitioning

creditors.

### C. The Bankruptcy Court's Finding that Crown and RTRR are not Qualifying Petitioning Creditors Based on the Settlement in the Wayne County Circuit Court

Appellants contend that Judge Tucker erred in concluding that they were not

qualifying petitioning creditors based on the settlement that was placed on the record in

the Wayne County Circuit Court.  According to appellants, DSC admitted on a number of

occasions during the bankruptcy proceedings that a binding settlement was reached by the

parties in the Wayne County litigation.  Appellants argue that Judge Tucker should have

found DSC bound by these admissions.  Alternatively, appellants contend that the

evidence established that there was a binding settlement agreement in the Wayne County

Circuit Court pursuant to which they held noncontingent, undisputed claims against DSC.

The Court does not find that DSC unequivocally admitted that it was bound by the

Wayne County settlement agreement.  While DSC admitted that it entered into a

settlement with Crown in its initial answer, DSC also stated that Crown's claim may be

contingent and may also be the subject of a bona fide dispute.  *See* Docket #15 ¶¶ 5-6.  In

its answer to the amended involuntary petition, DSC repeated its previous answer that

Crown's claim is contingent and may be the subject of a bona fide dispute.  *See*

Appellants' Supp. Ex. 18 ¶ 6.

Based on the evidence presented in the bankruptcy court trial, this Court also finds

that Judge Tucker did not clearly err in finding a genuine issue of material fact with

regard to whether appellants held a noncontingent, undisputed claim against DSC based

21

on the alleged Wayne County Circuit Court settlement.  Pursuant to Michigan law, a

settlement agreement is binding when it is made in open court or set forth in writing.

MCR 2.507(H)[7]; *Mikonczyk v. Detroit Newspapers, Inc.*, 238 Mich. App. 347, 349, 605

N.W.2d 360, 362 (1999).  "'An agreement to settle a pending lawsuit is a contract and is

to be governed by the legal principles applicable to the construction and interpretation of

contracts.'"  *Mikonczyk*, 238 Mich. App. at 349, 605 N.W.2d at 362 (quoting *Walbridge*

*Aldinger Co. v. Walcon Corp.*, 207 Mich. App. 566, 571, 525 N.W.2d 489 (1994)).  There

must be a meeting of the minds– in other words, mutual assent– on all the material facts

in order to form a valid agreement. *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 194 Mich.

App. 543, 548, 487 N.W.2d 499, 503 (1992); *Groulx v. Carlson*, 176 Mich. App. 484,

491, 440 N.W.2d 644, 648 (1989).  "A meeting of the minds is judged by an objective

standard, looking to the express words of the parties and their visible acts, not their

subjective state of mind." *Kamalnath*, 194 Mich. App. at 548, 487 N.W.2d at 503.

The transcript of the January 6, 2005 proceeding before Judge Borman indicates

that a settlement of the Wayne County lawsuit was not reached on the record in open

court.  As set forth previously, before the January 6 hearing ended, the issue was raised as

---

[7]Michigan Court Rule 2.507(H) provides:

> An agreement or consent between the parties or their
> attorneys respecting the proceedings in an action,
> subsequently denied by either party, is not binding unless it
> was made in open court, or unless evidence of the agreement
> is in writing, subscribed by the party against whom the
> agreement is offered or by that party's attorney.

to what would happen if DSC was not able to consummate its purchase agreement with

P&R.  Counsel for the plaintiffs stated the plaintiffs' position as to what should happen;

however, DSC's counsel clearly stated that DSC did not agree with those terms:

> MR. SEIKALY [appellants' counsel]: Is our proposal
> acceptable?  It's simple, everything remains the same, we lose
> our option, it bombs, and look it – One second.
>
> (Pause.)
>
> We'll give you 90 days to reaffirm the agreement with
> Randazzo.  If that can't happen within 90 days, which is a lot
> more than you've already asked for, then our mortgage
> becomes fixed and the only thing that changes is it's no
> longer a non-recourse mortgage.  Now, we've got no
> motivation to foreclose on it because it'll end up being worth
> – it won't be worth what's in it.  Or yeah –
>
> MR. BARR [DSC's counsel]: What do you mean?  No longer
> will – You mean the right to deficiency against Gibraltar Land
> Company?
>
> MR. SEIKALY: No, against the property.  The mortgage is
> against the property.
>
> MR. BARR: I understand.  But you're saying you have a right
> to foreclose, but you still do not have a right to get a
> deficiency on the mortgage.
>
> MR. SEIKALY: That's right.
>
> THE COURT: That's what he said, no deficiency.
>
> MR. BARR: Let me consult with my client.
>
> . . .
>
> MR. BARR: Your Honor, we're not able to agree to Mr.
> Seikaly's suggestion because the company does not think it

23

can accommodate that request.  If we might, we would like
the opportunity to consult with Mr. Randazzo and return to
the Court in not more than a week.

THE COURT: No.

MR. BARR: Well, otherwise we don't think we have a
meeting of the minds.  We're not able –

THE COURT: Why not?

MR. BARR: Because we can't agree to the fallback provision
that Mr. Seikaly is suggesting.

THE COURT: Then come up with another fallback position.
Now, do it now.

*See* DSC Ex. 28 at 32-34.  A "fallback provision" was never placed on the record as the

proceedings subsequently concluded and there is no evidence that a fallback position was

ever communicated to Judge Borman.[8]

Crown and RTRR contend that the letter from their counsel and DSC's counsel to

Judge Borman the following day– January 7– resolved any open issues, as it confirmed

that GLC and P&R had signed their agreement.  Judge Tucker correctly concluded,

however, that P&R's signature on the agreement was only one of several conditions that

the parties to the Wayne County lawsuit– particularly the plaintiffs– stated were essential

to guarantee that  the Randazzo deal was a "real deal."  As appellants' representative

---

[8]There in fact is no indication in the bankruptcy court record that the parties ever
resolved what would happen if DSC was not able to consummate its purchase agreement
with P&R.

24

Dannie Stamper testified during the bankruptcy trial, there were "three real questions" left to be resolved when the parties left Judge Borman's courtroom on January 6: (1) whether there was a signed purchase agreement; (2) whether any deposits had been paid; and (3) whether the deadlines in the purchase agreement could be met or extended.  *See* Trial Tr. 4/5/05 at 115.  Mr. Stamper specifically testified that DSC needed to resolve these three issues "to make the contract a binding contract."  *See id.* at 117-20 & 133.  But according to Mr. Stamper, the deadlines set forth in the P&R purchase agreement only were extended sometime in February– after the involuntary petition was filed– and appellants never received a confirmation from DSC that DSC received a deposit or a down payment from P&R.  *See id*. at 120 & 133-34.

An e-mail sent by Mr. Seikaly (appellants' counsel) to Mr. Barr (DSC's counsel) after January 6, 2005, suggests that appellants did not believe at the time that they were bound by the terms placed on the record before Judge Borman absent further assurances by DSC that its deal with P&R was a "real deal."  *See* DSC Ex. 31, Ex. 33, & Ex. 34.  In fact, in this Court's opinion, Mr. Stamper's testimony and Mr. Seikaly's post-January 6, 2005, correspondence with Mr. Barr create a genuine issue of material fact as to whether appellants considered themselves bound by the agreement placed on the record before Judge Borman even with further assurances regarding the Randazzo deal.  On January 26, 2005,  Mr. Seikaly sent a letter to Mr. Barr in which he stated that his client, after being informed that DSC is considering bankruptcy, "has instructed that we not proceed with the settlement agreement."  *See id*. Ex. 38.

25

While Crown and RTRR now contend that there was an enforceable settlement agreement in Wayne County, the above evidence indicates that an agreement was never placed on the record in open court.  Moreover, the evidence suggests that if DSC had attempted to enforce the alleged settlement agreement, the plaintiffs (including Crown and RTRR) would have argued to Judge Borman that they had not yet received satisfactory assurances that the Randazzo deal was a "real deal" and that this was an essential condition of the agreement being enforceable.

As the Court finds no error in Judge Tucker's finding that a settlement agreement was not made in open court, Crown and RTRR only could qualify as petitioning creditors based on the alleged settlement in the Wayne County Circuit Court if the agreement was set forth in writing.  MCR 2.507(H). Clearly, however, the settlement was not reduced to writing.  As Judge Tucker correctly concluded, *see* 4/26/05 Trial Tr. at 49, Crown and RTRR refused to execute the settlement documents prepared by DSC's attorney, claiming that there were outstanding issues to be resolved.  *See* DSC Ex. 31, 33, 35 & 38.

This Court therefore finds that Judge Tucker did not abuse his discretion in finding that appellants did not qualify as petitioning creditors based on the alleged Wayne County Circuit Court settlement.

**D.    The Bankruptcy Court's Finding that Appellants are not Qualifying Petitioning Creditors Based on the Environmental Obligations Implementation Agreement or the Right of First Refusal Agreement**

Alternatively, appellants contend that they qualified as petitioning creditors based on DSC's breach of the Environmental Obligations Implementation Agreement ("EOIA")

26

and/or the Right of First Refusal Agreement ("RFRA").  Finding a bona fide dispute as to the fact of DSC's liability or the amount of DSC's liability pursuant to these agreements, the bankruptcy court rejected appellants' argument.  For the following reasons, this Court finds no error in Judge Tucker's conclusions.

With respect to the EOIA, the agreement was executed by Crown and DSC and required DSC to clean up the 76 acres of Riverview-Trenton land it sold to Crown. Crown, however, subsequently transferred the land to RTRR.  Yet, Crown's rights under the EOIA did not convert to RTRR absent an assignment by Crown.  As paragraph 8(e) of the EOIA states: "All of the provisions of this Agreement shall bind and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns." *See* DSC Ex. 5.  There was no evidence of an assignment by Crown to RTRR.

As to the RFRA, there was no dispute that DSC breached the agreement when it transferred the Randazzo Parcel to Gibraltar Land Company ("GLC") because the transfer was not pursuant to a "bona fide" sale.  *See* DSC Ex. 4 ¶ 4.  There was no evidence, however, establishing DSC's liability for an undisputed amount as a result of that breach. The transfer did not destroy appellants' rights under the agreement.  Moreover, because the transfer was not pursuant to a "bona fide" sale, appellants did not have the right to purchase the property pursuant to GLC's terms and conditions. The RFRA only gave Crown and/or RTRR the right to exercise the right of first refusal and purchase the Randazzo Parcel pursuant to the terms of a "bona fide" sale.  *See id.* ¶ 1.

There was a dispute between the parties with respect to whether DSC breached the

RFRA with respect to the P&R purchase agreement. There was testimony from DSC's witnesses that DSC presented the offer to appellants but appellants did not exercise their right of first refusal. But even if DSC failed to give appellants the right to match P&R's offer, there was no dispute that the purchase agreement between DSC and P&R had not been consummated at the time of the bankruptcy trial and in fact there was some doubt at that time as to whether the deal ever would be completed. Thus there was a genuine issue of material fact with respect to whether appellants would suffer any damages as a result of DSC's alleged breach of the RFRA.

## IV.  Conclusion

Having reviewed the entire evidence presented below, this Court concludes that the bankruptcy court did not abuse its discretion in dismissing the involuntary bankruptcy petition against DSC for lack of a sufficient number of qualifying petitioning creditors. While O'Brien & Gere expressed an interest in joining the bankruptcy petition, at this time it has withdrawn its notice of joinder and participation in the proceedings. While it is a well established rule that a petitioning creditor may not withdraw from an involuntary petition if doing so will result in an insufficient number of qualifying petitioning creditors, this Court concludes that the rule does not apply here because O'Brien & Gere had not officially joined the petition before it withdrew. The Court further finds that Crown and RTRR do not hold claims against DSC that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount.

Accordingly,

28

**IT IS ORDERED**, that the April 26, 2005 decision of the bankruptcy court is

**AFFIRMED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Honorable Thomas J. Tucker
Geoffrey L. Silverman, Esq.
K. Scott Hamilton, Esq.

30